**IN THE UNITED STATES DISTRICT
COURT DISTRICT OF VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>      Plaintiff,<br><br>                           v.<br><br>**ORIANA BARCONEY**<br>      Defendant. | Criminal No. 2017-11 |

**UNITED STATES' SURREPLY TO DEFENDANT'S REPLY TO THE UNITED
STATES' OPPOSITION TO HER MOTION TO SUPPRESS EVIDENCE AND
STATEMENTS**

The United States of America, by and through the undersigned attorneys, respectfully offers this surreply to the defendant's reply to the government's opposition to the motion to suppress evidence and statements. The United States maintains that the search at issue was lawful and reincorporates herein the majority of the analysis set forth in its Opposition, ECF No. 26. In doing so, the United States clarifies the authorities upon which it relies.

## I. INTRODUCTION

The suppression issue before this Court is a discrete question, unique to the U.S. Virgin Islands ("Virgin Islands"), because the Virgin Islands is the only place where U.S. Customs and Border Protection ("CBP") administers the customs laws of a different government. "When the United States purchased the Virgin Islands from Denmark in 1917, laws were already in place which provided for customs duties to be levied upon goods coming into the Virgin Islands, with the revenue going to the colonial treasury." *Paradise Motors, Inc. v. Murphy*, 892 F. Supp. 703, 704-06 (D.V.I. 1994) (citation omitted). As the result of a deliberate Congressional policy, Virgin Islands customs laws were retained in the Territory after the transfer, with officials of the U.S.

Customs and Postal Services (and their successor agencies) tasked with assisting in the collection of such duties. *Id.* These laws remain in effect today. 48 U.S.C. §§ 1392, 1394–1396. The United States submits that the underlying search in this case was a lawful exercise of CBP's authority (and indeed duty) to administer the Virgin Islands' customs laws when viewed under the relevant controlling statutes. Alternatively, the United States submits that the search should be upheld under the good faith exception.

## II. LEGAL LANDSCAPE

### A. The Border Search Exception, Generally

Under the Fourth Amendment, searches and seizures must be reasonable. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) (citation omitted). A challenged law enforcement action "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* (internal quotation marks and citations omitted). The "border search" exception recognizes "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Thus, "import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations." *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 125 (1973) (explaining that such restrictions and searches are an exercise of the "broad, comprehensive powers" the Constitution vests with Congress under its authority "'[t]o regulate Commerce with foreign Nations.'") (citing Art. I, s. 8, cl. 3).

The Supreme Court has many times reaffirmed the border search doctrine, reiterating its pre-Constitutional origin. *See, e.g., Montoya de Hernandez*, 473 U.S. at 537-539; *Ramsey, supra*; *12 200-Ft. Reels of Film*, 413 U.S. at 125-126; *Carroll v. United States*, 267 U.S. 132, 154 (1925). Indeed, as early as *Boyd v. United States*, 116 U.S. 616, 623 (1886), the Supreme Court explained that the border search doctrine was not subject to the warrant provisions of the Fourth Amendment, pointing to clear historical evidence that at the time of the adoption of the Bill of Rights, customs searches were not regarded as unreasonable and were therefore not intended to come within the prohibitions of the Fourth Amendment:

> The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment.

*Id.* at 623 (footnote omitted).

It is clear from the language of that first customs statute that the driving force behind granting customs officials such broad powers to search was to ensure the payment of duties on goods subject to such taxes. Section 23 of the statute provided in part that:

> [I]it shall be lawful for the collector, or other officer of the customs, after entry made of any goods, wares or merchandise, on suspicion of fraud, to open and examine, in the presence of two or more reputable merchants, any package or packages thereof . . .; but if any of the packages so examined be found to differ in their contents from the entry, and it shall appear that such difference hath been made with intention to defraud the revenue, then all the goods, wares or merchandise contained in such package or packages, shall be forfeited . . .

Act of July 31, 1789, 1 Stat. 29, 43. Section 24 of the customs statute provided, in pertinent part:

> That every collector, naval officer and surveyor, or other person specially appointed

by either of them for that purpose, shall have full power and authority, to enter any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed; and therein to search for, seize, and secure any such goods, wares or merchandise . . .

As the Supreme Court noted in *Montoya de Hernandez*, "[s]ince the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Id.* at 473 U.S. at 537. And again in *12 200-Ft. Reels of Film*, 413 U.S. at 125, the Court referred to searches at the borders, noted the Constitution's grant of broad powers to Congress to regulate commerce with foreign nations (Art. I, Sec. 8, cl. 3), and observed that "[h]istorically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." The Supreme Court has thus made clear that the border search doctrine is based largely on the twin customs concerns of revenue collection and the prohibition of illegal goods.

Customs officers operating at the border typically conduct border searches related to "contraband, dutiable merchandise, immigration fraud, and terrorism." *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015). This enforcement authority extends beyond those laws and enforcement areas that CBP is explicitly tasked with enforcing, however, as "CBP officers are neither expected nor required to ignore tangible or documentary evidence of a federal crime." *Id*. Customs officers also have broad range to search for contraband at the border, as "the government may search *wherever evidence of contraband may be found*, so long as the scope and duration of the search is reasonable." *United States v. Mendez*, 240 F. Supp. 3d 1005 (D. Ariz. 2017) (emphasis added).

**B. The Virgin Islands' Customs Border**

*United States v. Hyde,* 37 F.3d 116 (3d Cir. 1994), explains the unique history of the Virgin Islands and the congressionally authorized customs border between the USVI and the United States. As an unincorporated territory, the Virgin Islands is "subject to the power of Congress under Article IV, Section 3 of the Constitution to make rules and regulations to govern the territory." *Id.* at 121. "[N]ot all territory over which a sovereign exercises sovereignty has the same legal status, and borders between 'incorporated' and 'unincorporated' territory of a sovereign have many of the characteristics of international borders." *Id.* Indeed, Congress has the authority to apply "all laws effecting imports of articles, goods, wares, and merchandise and entry of persons into the United States from foreign countries" to the importation of such items and the entry of persons into the United States from the United States' own unincorporated territories. *David Kaufman & Sons Company v. Smith*, 216 U.S. 610, 611 (1910). *See also United States v. Washington*, 586 F.2d 1147, 1153 (7th Cir. 1978) ("[w]hatever may be the status of the Canal Zone vis-a-vis the United States for other purposes, it is clear that for purposes of customs and entry the Canal Zone is a foreign country"). It is thus well established that a sovereign nation has the power to treat the importation of goods and the entry of people from its unincorporated territories as though they were foreign goods and people.

Upon acquiring the Virgin Islands in 1917, Congress chose to do just that by treating the Virgin Islands as a separate customs zone from the customs zone of the United States. The first charter of government for the Virgin Islands under American rule, the 1917 Organic Act, provided, with certain exceptions, that "[t]here shall be levied, collected, and paid upon all articles coming into the United States or its possessions from the Virgin Islands the rates of duty and internal-revenue taxes which are required to be levied, collected, and paid upon like articles imported from

foreign countries." *See* Act of March 3, 1917, § 3. This provision remains in force today. *See* 48 U.S.C. § 1394. The 1917 Organic Act, with certain modifications, "specifically extended the Danish customs laws in place in the islands at the time of the transfer." *Paradise Motors,* 892 F. Supp. at 705 (citing Act of March 3, 1917 (codified as amended at 48 U.S.C. §§ 1392, 1394–1396)).

These Danish customs laws referred primarily to the import duty established and enforced pursuant to two 1914 Danish laws. *Id.* "The first law," Danish Law No. 64, "imposed a 6% 'import duty' on all goods imported into St. Thomas and St. John." *Id.* (citing Danish Law No. 64 of April 1, 1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan.). "The second law, Ordinance of August 6, 1914, promulgated rules for the collection of the import duty established by Danish Law No. 64." *Id.* The 1917 Organic Act modified Danish Law No. 64 by providing that certain goods from the United States were to be imported duty-free. Act of March 3, 1917, § 3. This provision remains in effect today. 48 U.S.C. § 1395. Moreover, Congress placed U.S. Customs and Postal Service officials (or their successor agencies') in charge of collecting such customs duties and taxes, with the revenues paid into the Virgin Islands' treasury. Act of March 3, 1917, § 4. This, too, remains in effect today. 48 U.S.C. § 1395. Over the years, Congress amended the 1917 Organic Act a number of times, but with each new iteration, kept in place the Danish customs duties.[1] In sum, "[a]s a result of Congress' decision to treat the Virgin Islands as

---

[1] The 1936 Organic Act, codified as amended at 48 U.S.C. §§ 1405–1406m, for example, "expressly extended the customs duties established under Danish law with the proviso that the Secretary of the Treasury administer the customs laws in the Virgin Islands." *Paradise Motors*, 892 F. Supp. at 705 (citing 1936 Organic Act, § 36 (codified at 48 U.S.C. § 1406i)). Indeed, the 1936 Organic Act extended the Danish customs laws to all of the Virgin Islands (to include St. Croix). *Id.* at n. 2. The Revised Organic Act, meanwhile, "carried forward all Danish colonial laws then in force in the Territory, so long as they were 'not inconsistent' with the new law," and further provided that the proceeds of all (Danish) customs duties from goods imported into the Virgin Islands were to be covered in the Virgin Islands treasury. *Id.* (citing Revised Organic Act

a separate 'customs zone,' with a separate customs border, the Danish customs laws of 1914 survive." *Id.* (internal citations omitted).

Consistent with this treatment, the Tariff Act of 1930 specifies that the United States customs territory excludes the Virgin Islands. 19 U.S.C. § 1401(h). *See also* 19 C.F.R. § 7.2(c) ("The Secretary of the Treasury administers the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection. The importation of goods into the U.S. Virgin Islands is governed by Virgin Islands law; however, in situations where there is no applicable Virgin Islands law or no U.S. law specifically made applicable to the Virgin Islands, U.S. laws and regulations shall be used as a guide and be complied with as nearly as possible. Tariff classification of, and rates of duty applicable to, goods imported into the U.S. Virgin Islands are established by the Virgin Islands legislature.").

In its previous filing, the United States pointed to a number of statutes, particularly 19 U.S.C. §§ 1467 and 1581, in connection with the search at issue here. The United States recognizes that neither of these two statutes, nor any statute or regulation that relates to CBP's enforcement of *federal* customs laws (*i.e.,* the Tariff Act) answer the issue here, which involves a search of luggage that arrived on an aircraft from the customs territory of the United States to the Virgin Islands. Rather, the authority to conduct the search at issue derives from the authority that Congress, in the Organic Act (and its subsequent revisions), vested with CBP to enforce the Virgin Islands' customs laws.

---

§ 8(c), 48 U.S.C. 1574(c) and Revised Organic Act § 28(a), 48 U.S.C. § 1642). In 1977, "Congress amended the Revised Organic Act to allow the Virgin Islands Legislature to permit duty-free importation of goods into the Virgin Islands and to vary the customs duties carried over from Danish law below '6 per centum ad valorem' or its equivalent." *Paradise Motors*, 892 F. Supp. at 705; 48 U.S.C. §§ 1574(f)(1)-(2).

## III. ARGUMENT

### A. The Search Was a Lawful Exercise of CBP's Authority to Administer the Virgin Islands' Customs Laws.

This Court need not decide whether the search at issue was authorized by the international border search exception because the search conducted in this case was authorized by the provisions in the Organic Act vesting the Secretary of Treasury (and, in turn, CBP) with enforcing the Virgin Islands' customs laws. *See, e.g.,* 48 U.S.C. §§ 1395, 1406h and 1406i. *See also* 19 C.F.R. § 7.2(c). While the Virgin Islands customs laws are admittedly more limited than the vast expanse of customs laws found in the Tariff Act and its implementing regulations, there are two Danish customs laws of particular importance here. Specifically, the surviving laws include the right of CBP officers to make "a detailed examination of [imported] goods," Organic Act of 1936, § 5, as well as the mandate that "[f]irearms, ammunition, inflammable and explosive substances, . . . be imported under compliance with such rules of control which the Government prescribes," Organic Act of 1936, § 3.

Moreover, the Virgin Islands Legislature, pursuant to the lawful authority extended to it under 48 U.S.C. § 1574, has enacted procedures for the collection of excise taxes on domestic imports. *See* V.I. Code Ann. tit. 33, § 42c. Further, if an article of foreign origin is imported into the Virgin Islands from the United States customs zone, that article pays a total of 6% duty, which includes the duty paid to the United States. V.I. Code Ann. tit. 33, § 525. CBP's authority to collect such excise duties is found in V.I. Code Ann. tit. 33, § 50 (authorizing "employees of the United States Customs Department and the United States Postal Service . . . to assist the appropriate officials of the Government of the United States Virgin Islands in the assessment and collection of the excise taxes herein imposed," and further providing that "[a]ny officer may at any time go on board any vessel or aircraft arriving in the Virgin Islands from any place outside thereof

and examine, inspect and search the vessel or aircraft and any person, baggage, package, or cargo on board, or which is being, or has been, unladen from such vessel or aircraft.").

As such, CBP, which is tasked with administering the Virgin Islands customs laws, may make detailed examinations of items arriving in its customs zone to ensure that dutiable goods are not being smuggled in an effort to avoid the payment of such duties. Similarly, CBP officers may conduct such examinations at the Virgin Islands' border to ensure that any firearms brought into the Virgin Islands are done so in compliance with Virgin Islands law. *See, e.g.,* 19 C.F.R. § 7.2(c) ("The Secretary of the Treasury administers the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection. The importation of goods into the U.S. Virgin Islands is governed by Virgin Islands law[.]"). *See also* V.I. Code Ann. tit. 42, § 467a ("Except as provided in section 476 of this chapter, whoever, without being licensed in accordance with this chapter, imports, carries, or brings any firearm or ammunition into the Virgin Islands and fails to report to the Commissioner as required by section 470 of this chapter shall be punished by a fine of not less than $50,000 or imprisonment for a minimum of 25 years or both fine."); *id.* at § 470(a) (requiring anyone "entering the Virgin Islands and bringing any firearm or ammunition shall declare all firearms and ammunition to the Commissioner or the Commissioner's designee immediately upon arrival to any port of entry and shall furnish a complete description of all firearms and ammunition brought into the Virgin Islands").

The scope of the search at issue was in keeping with the authority provided under each of these provisions. Accordingly, the defendant's motion to dismiss should be denied.[2] The fact that

---

[2] The CBP officer's subjective beliefs regarding the role of his search authority are irrelevant here. As the Supreme Court has made clear: "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, the fact that the officer does not have the state

the items found smuggled turned out to be controlled substances is immaterial – rather, the inquiry is one of scope and duration. As explained, the search here was consistent with CBP's long-established authority (and, indeed, duty) to administer the Virgin Islands' customs laws. Moreover, in conducting the limited X-ray search of the defendant's luggage, the CBP officers were "neither expected nor required to ignore" contraband – here, marijuana. *Levy*, 803 F.3d at 124.

### B. The Search Was Reasonable Under the Fourth Amendment.

Logic compels the conclusion that if the requirements of a customs border search were established when the traveler in *Hyde* crossed a customs border from the Virgin Islands to the United States, it must follow that the same border would be crossed by a passenger travelling from the United States to the Virgin Islands. If the words "customs border" are to mean anything, they must signify that it is a border for customs purposes that authorizes customs officials to search persons and goods between the Virgin Islands and the rest of the United States, regardless of what

---

of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. . . . The Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent. . . . Evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). *See also, e.g., Whren v. United States*, 517 U.S. 806, 814 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."); *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) (noting that "[t]he parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment"). Moreover, while *Devenpeck* involved an arrest, as opposed to a search, the principle is the same and applies to all Fourth Amendment analyses. *See, e.g., Whren,* 517 U.S. at 814 (applying same principle to a seizure); *Bond,* 529 U.S. 334, 338 n.2 (applying the same to a search). Applying that principle here, the CBP officer's actions were authorized by his authority to enforce Virgin Islands' customs laws. The use of an X-ray machine unquestionably is in keeping with such enforcement. Thus, the scope of the search conducted in this case did not exceed the scope of what a lawful search conducted to enforce the Virgin Islands' customs laws would entail.

direction they travel. Because it is *not* an "imaginary border," this customs border does not disappear when the person or goods travel from the United States to the Virgin Islands.

When merchandise is departing the United States, it is being exported from the United States customs zone and that same merchandise is being imported into the Virgin Islands customs zone. As the Third Circuit stated in *Hyde*: "Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that customs border as similar traditional searches have universally been recognized to be the objectives of traditional customs systems at international borders. Thus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this 'internal' border to be little different from its interest in such searches at its international borders." *Id.* at 122. Accordingly, the Third Circuit, in both *Hyde* and in *United States v. Pollard,* 362 F.3d 397 (3d Cir. 2003), recognized the existence of a customs border between the United States and the Virgin Islands permitting warrantless border searches.

Due consideration of the origin and purposes of the border search doctrine, as detailed above in Section II, Subsection A, as well as the statutory authority provided in the Organic Act, compels the conclusion that Congress must have envisioned CBP conducting the same sort of customs searches on items entering the Virgin Islands from outside thereof when it tasked CBP with administering the Virgin Islands' customs laws. The "[r]outine warrantless searches without probable cause" approved of in *Hyde* are just "as essential to the accomplishment" of administering the customs laws retained in the Virgin Islands' customs zone. *Hyde,* 37 F.3d at 122.

This case is thus distinguishable from *Torres v. Puerto Rico,* 442 U.S. 465 (1979), where the Supreme Court struck down a statute enacted by the Commonwealth of Puerto Rico permitting police officers to search the luggage of any person arriving in Puerto Rico from the United States.

The Court rejected the Commonwealth's attempt to justify the statute by analogizing to "customs searches at a functional equivalent of the international border of the United States." 442 U.S. at 472. The Court explained that "[t]he authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity" and that, unlike the federal government, "Puerto Rico has no sovereign authority to prohibit entry into its territory as with all international ports of entry, border and customs control for Puerto Rico is conducted by federal officers." *Id*. at 472-473. Here, unlike Puerto Rico, Congress deliberately chose to maintain a customs zone for the Virgin Islands, separate from that of the United States. In doing so, it tasked CBP with administering the customs laws of this distinct customs zone.

Just as the *Hyde* court's conclusion that routine warrantless searches are necessary to enforce customs laws applies with equal force on both ends of the customs border, so too does the court's conclusion that the reasonable expectations of individual privacy are not materially different from the lowered expectations of travelers at the international border. *Id.* By virtue of the fact that warrantless searches are essential to administering the Virgin Islands' customs laws, there is a lowered expectation of privacy upon entering the Virgin Islands' customs zone. And, just as in *Hyde,* the Virgin Islands' interest in enforcing its customs laws with the search conducted here – an X-ray search of luggage arriving in the Virgin Islands customs zone from outside thereof – outweighs the defendant's already-lowered expectation of privacy. The X-ray search of the defendant's luggage, therefore, was a permissible search under the Fourth Amendment.[3]

---

[3] So long as the Court finds the initial X-ray scan lawful, as the United States argues it was, the fact that CBP requested the assistance of a drug detection dog upon noticing an anomaly in the bag is of no moment. Consistent with the long-standing authority outlined above approving of inspecting luggage for customs purposes, CBP officers had the right, with or without reasonable suspicion, to fully inspect any luggage arriving in the Virgin Islands' customs zone. Accordingly,

### C. Alternatively, the Search Should Be Upheld Under the Good Faith Exception.

The law enforcement officials involved in the underlying search acted in good faith. Because reasonableness is the prevailing measure of whether official conduct complies with the Fourth Amendment, even in those circumstances where violations do occur, evidence should not be suppressed if law enforcement agents act in objective good faith. The Supreme Court has repeatedly emphasized that the exclusionary rule should be applied only to instances in which its application would plainly deter future police misconduct, not when it would punish scrupulous officers. *See Davis v. United States*, 131 S. Ct. 2419, 2428-29 (2011) (refusing to apply exclusionary rule under circumstances where it "would deter . . . conscientious police work"); *Herring v. United States*, 555 U.S. 135, 136 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."); *United States v. Leon*, 468 U.S. 897, 919-20 (1984) ("[W]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances.") (internal quotation marks omitted).

Heeding these principles, the Third Circuit has observed that "[w]hether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's Fourth Amendment rights," and the rule's application must be "limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014);

---

CBP need not have noticed the anomaly on the X-ray, let alone relied upon the canine sniff, to justify opening the luggage here.

*see also Davis,* 131 S. Ct. at 2427 (explaining that the exclusionary rule "exacts a heavy toll on both the judicial system and society at large," and should be applied "only as a 'last resort'") (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "Accordingly, [courts] must determine whether--on the[] particular facts--the agents acted with a good faith belief in the lawfulness of their conduct that was 'objectively reasonable.' . . . If so, suppression is unwarranted." *Katzin,* 769 F.3d at 182.

The *Katzin* court squarely rejected the argument that application of the good faith exception required, at a minimum, reliance on binding appellate precedent, recognizing that "[t]o exclude evidence simply because law enforcement fell short of relying on binding appellate precedent would impermissibly exceed the Supreme Court's mandate that suppression should occur in only 'unusual' circumstances: when it "further[s] the purposes of the exclusionary rule." *Id.* at 177 (quoting *Leon,* 468 U.S. at 918). The Third Circuit reiterated that courts "must limit operation of the exclusionary rule 'to situations in which [its] purpose,' deterring future Fourth Amendment violations, is 'most efficaciously served.'" *Id.* at 178 (quoting *Davis,* 131 S. Ct. at 2426). As such, courts must assess "both '[r]eal deterrent value' and 'substantial societal costs,'" with the inquiry "focus[ed] on the 'flagrancy of the police misconduct' at issue." *Id.* (quoting *Davis*, 131 S. Ct. at 2427). Suppression is appropriate "[o]nly when, after a 'rigorous weighing,'" a court concludes that "the deterrence benefits of suppression . . . outweigh its heavy costs . . . ." *Id.* (quoting *Davis,* 131 S. Ct. at 2427). Ultimately, the question is one of "whether the officers' conduct was deliberate and culpable enough that application of the exclusionary rule would 'yield meaningfu[l] deterrence,' and 'be worth the price paid by the justice system.'" *Id.* (quoting *Davis,* 131 S. Ct. at 2428). When police act on the objectively-reasonable good-faith belief that their conduct is legal, "the deterrence rationale loses much of its force and exclusion cannot pay its

way." *Id*. at 181. This is true, "even in the absence of binding appellate precedent." *Id.* at 178.

In this case, there is admittedly no binding precedent addressing searches conducted on flights arriving in the Virgin Islands directly from the mainland. There is, however, a plethora of district court decisions holding that the extension of the border search exception recognized in *Hyde* applies to both sides of the customs border. Indeed, even before *Hyde*, in *United States v. Chabot*, the district court, in a published opinion, upheld a border search conducted on a passenger arriving in St. Croix from Puerto Rico, recognizing that a person who enters the Virgin Islands from the United States, *like a person traveling in the opposite direction*, is considered to have crossed a border within the framework of the border search exception to the warrant requirement. 531 F. Supp. 1063, 1069 (D.V.I. 1982). The *Chabot* court explained that the territory of the Virgin Islands is a customs zone separate from the United States, Puerto Rico, and other United States possessions as is evident by the statutes that govern the collection of customs duties and the enforcement of immigration laws in the Virgin Islands. *Id.* "Consequently, the island of St. Croix constitutes a border or its functional equivalent within the meaning of the border search exception to the warrant requirement." *Id.*

Following the reasoning in *Chabot* and *Hyde*, the district court in *United States v. Herbert*, 886 F. Supp. 524 (D.V.I. 1995), recognized in another published opinion that "a two-way customs border was created by sections 3 and 4 of the Organic Act of 1917[.]" While noting that customs inspections on flights arriving in the Virgin Islands were, at that point in time, seldom conducted, the district court found no authority to suggest that the power and authority to conduct a routine border search was lost from such disuse. *Id.*

Thereafter, in *United States v. Mark*, No. 2006 Cr. 80, 2007 WL 2669576 at *9 (D.V.I. Sept. 7, 2007), the district court found that the search of a traveler bound for St. Thomas from

Atlanta, Georgia "was a border search, for which no search warrant, probable cause, or consent was necessary." Similarly, in reviewing the analysis of the Territorial Court of the Virgin Islands, the district court, sitting as the Appellate Division of the District Court of the Virgin Islands, upheld the warrantless of a passenger upon his arrival to St. Thomas from Atlanta, Georgia. *David v. Gov't of the Virgin Islands*, 2009 W.L. 1872678 (D.V.I. June 25, 2009). In doing so, the court announced it was "unaware of any valid legal authority for the proposition that the border between the Virgin Islands to the mainland operates only one-way. On the contrary, a person who enters the Virgin Islands from the continental United States, like a person traveling in the opposite direction, is considered to have crossed a border within the meaning of the border search exception to the warrant requirement." *Id.* at *5. *See also United States v. Rivera*, 2014 WL 5395792, *7 (D.V.I. Oct. 23, 2014) (holding a border search of passenger from St. Croix to St. Thomas impermissible but noting that if the passengers had arrived in the Virgin Islands from the United States, they could be legally searched "because they actually crossed a border.") (citing *David*, 2009 WL 1872678 at *5).

At the time of the search at issue, not a single case had cast any doubt on the long-standing conclusion that the border search exception extended equally to both sides of the customs border. Indeed, it was only upon the Federal Public Defender's recent briefing that the United States Attorney's Office (USAO) had any reason to consider this practice at all. In light of the overwhelming and consistent case law expressly approving of the search undertaken in this case, there is no "wrongful" police conduct to deter. As such, suppression simply would not advance the goal of the exclusionary rule. *See Katzin,* 769 F.3d at 185. This is all the more so when "the significant social costs" of suppressing the evidence in this case, upon which the government's entire case against the defendant turns. *Id.* at 182 (finding that, where there was no police

misconduct, suppression was "inappropriate because it would not outweigh the significant social costs of suppressing reliable, probative evidence, upon which the Government's entire case . . . turns.") (quoting *Leon*, 469 U.S. at 909).

In sum, because suppressing the evidence in this case would not advance the goal of the exclusionary rule, in that there was no "wrongful" police conduct, the cost of suppression (which would result in a dismissal, as the evidence constitutes the entirety of the government's case) is far outweighed, particularly where, as here, the USAO has implemented measures to ensure that searches are limited in scope as discussed above.

**WHEREFORE**, the United States respectfully requests that defendant's motion to suppress be denied.

**RESPECTFULLY SUBMITTED**,

In St. Croix, USVI, on October 15, 2018.

**GRETCHEN C.F. SHAPPERT**
United States Attorney

BY: /s/ Meredith Edwards
Meredith Edwards
Assistant U.S. Attorney
5500 Veterans Dr., Ste. 260
St. Thomas, VI 00802
(340) 774-5757
meredith.edwards@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this same date, I caused a true and correct copy of the foregoing **GOVERNMENT'S SURREPLY TO DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND STATEMENTS** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the defense counsel on record:

Brendan A. Hurson, Esq.
Assistant Federal Public Defender
1336 Beltjen Rd., Suite 202
St. Thomas, VI 00802
(340) 774-4449
Brendan_Hurson@fd.org

           /s/ Meredith Edwards
           BY: Meredith Edwards
           Assistant U.S. Attorney
           5500 Veterans Dr., Ste. 260
           St. Thomas, VI 00802
           (340) 774-5757
           meredith.edwards@usdoj.gov