# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2017-0011 |
| | ) | |
| ORIANA BARCONEY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2017-0012 |
| | ) | |
| NATHALIE LOPEZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2018-0004 |
| | ) | |
| DEQUAN FORDE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
**Meredith J. Edwards, Esq.,**
St. Thomas, U.S.V.I.
*For the United States*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
*For Defendants Oriana Barconey and Dequan Forde*

**Yohana M. Manning, Esq.,**
St. Croix, U.S.V.I.
*For Defendant Nathalie Lopez*

**Kia D. Sears, Esq.,**
St. Thomas, U.S.V.I.
*For Defendant Dequan Forde*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the Motions to Suppress filed in *United States v. Oriana Barconey*, Criminal Action No. 2017-0011 (hereinafter "*Barconey*") (Dkt. No. 19), *United States v. Nathalie Lopez*, Criminal Action No. 2017-0012 (hereinafter "*Lopez*") (Dkt. No. 24), and *United States v. Dequan Forde*, Criminal Action No. 2018-0004 (hereinafter "*Forde*") (Dkt. No. 14). Each Motion raises an identical question of law for resolution by the Court: whether the warrantless and suspicionless searches of individuals and their luggage performed by United States Customs and Border Protection ("CBP") officers as Defendants' flights arrived at the Henry E. Rohlsen airport on St. Croix, United States Virgin Islands ("Virgin Islands"), from the continental United States were reasonable under the Fourth Amendment.[1] For the reasons that follow, the Court concludes that the searches were unreasonable and thus constitutionally impermissible. However, because the Court finds that the good faith exception to the exclusionary rule applies, the Court will deny Defendants' requests to suppress the tangible evidence discovered as a result of the searches.

## I.     BACKGROUND[2]

In each of the above-captioned cases, CBP Officer Richard Anderson performed x-ray examinations of luggage arriving at the Henry E. Rohlsen airport on St. Croix on American Airlines

---

[1] The Court uses the terms "continental United States" and "mainland United States" interchangeably throughout this Opinion to refer to the "United States" as defined by the Tariff Act of 1930—which includes the states and "all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam." 19 U.S.C. § 1401(h).

[2] The Court bases the background factual discussion in this section on the records established at the suppression hearings held in the above-captioned cases. The Court provides this information solely for purposes of the pretrial motions, ever mindful that Defendants are presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

flights from Miami, Florida.[3] Officer Anderson observed "unusual packaging" in the luggage involved in each case. Following Officer Anderson's observations, CBP officers performed physical searches of the luggage, revealing packages containing substances that later field-tested positive for the presence of marijuana.[4] After discovering the alleged marijuana, law enforcement performed controlled deliveries by placing the luggage on the baggage carousel and conducting surveillance in the baggage claim area at the airport. Defendants Barconey and Forde were detained by law enforcement after they personally retrieved the luggage from the baggage carousel, while Defendant Lopez was detained in the airport after her co-defendant retrieved the luggage.[5]

Defendants were subsequently charged with federal narcotics offenses.[6] Defendants argue in their respective Motions to Suppress that the tangible evidence seized following the searches of their luggage by CBP officers should be suppressed because the warrantless x-ray examinations of their luggage—performed absent probable cause or reasonable suspicion—violated the Fourth

---

[3] The x-ray examinations and subsequent physical searches at issue were performed on February 16, 2017 (*Barconey*), February 17, 2017 (*Lopez*), and February 7, 2018 (*Forde*), respectively.

[4] In two cases—*Barconey* and *Lopez*—a CBP K9 performed a "sniff test" on the luggage following Officer Anderson's observation of unusual packaging. The K9 alerted to the presence of narcotics in the luggage in both cases, at which point CBP officers performed physical searches of the luggage. A K9 sniff test was not performed prior to the CBP officers' physical search of the luggage in *Forde*.

[5] Officers performed a pat-down search of Defendant Barconey and searched her purse while in the baggage claim area at the airport.

[6] Defendants Barconey, Lopez, and Forde were each charged with Possession of Marijuana with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). Defendants Barconey and Lopez were charged with Possession of Marijuana on Board an Aircraft with Intent to Distribute in violation of 21 U.S.C. §§ 959(c)(2) and 960(a)(3), while Defendant Forde was charged with Possession of Marijuana on Board an Aircraft with Intent to Distribute in violation of 21 U.S.C. §§ 959(c)(2), 960(a)(3), and 960(b)(4). Defendants Lopez and Forde were also charged with Conspiracy to Possess Marijuana with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846.

Amendment's prohibition on unreasonable searches and seizures.[7] The Government concedes that the searches were conducted without a warrant, probable cause, or reasonable suspicion. It contends, however, that the x-ray searches fall within the "border search exception," such that they were reasonable by Fourth Amendment standards.[8] A suppression hearing was held in each case, and the parties subsequently submitted supplemental briefing as ordered by the Court.

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Fourth Amendment

The Fourth Amendment prohibits government agents from conducting unreasonable searches and seizures. *United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994) (citing *Harris v. United States*, 331 U.S. 145, 150 (1947)); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

[7] An x-ray examination constitutes a search for Fourth Amendment purposes. *United States v. Doe*, 786 F. Supp. 1073, 1079 (D.P.R. 1991) ("Use of an x-ray machine. . . to divine the contents of a closed bag . . . is a search for purposes of the fourth amendment.") (citing *United States v. Epperson*, 454 F.2d 769 (4th Cir. 1972)); *see also United States v. Hartwell*, 436 F.3d 174, 179 (3d Cir. 2006) (observing that "[t]he search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching"); *United States v. Rivera*, 2014 WL 5395792, at *4 & n.9 (D.V.I. Oct. 23, 2014) (noting that the government conceded that the initial x-ray of defendant's luggage at St. Thomas airport constituted a Fourth Amendment search); *United States v. Henry,* 615 F.2d 1223, 1227 (9th Cir. 1980) ("The x-ray scan . . . is clearly a search. It is true that it is less intrusive than a physical search, but it nonetheless reveals, to a certain extent, articles the owner has chosen to conceal from view. It is certainly a more intrusive device than the magnetometer, the use of which has been held to constitute a search."); *United States v. Haynie*, 637 F.2d 227, 230 (4th Cir. 1980) (examination of closed container by means of x-ray scanner constitutes Fourth Amendment search).

[8] In its supplemental briefing, the Government states for the first time that the Court "need not decide whether the search[es] at issue w[ere] authorized by the international border search exception" because the searches conducted in these cases were authorized by Virgin Islands customs laws. (*Forde*, Dkt. No. 48 at 7-8). The Court is unsure what to make of this assertion, as the Government presents no argument that the searches were lawful pursuant to some other exception to the Fourth Amendment's warrant requirement. In the absence of such an exception, the searches conducted here would be unreasonable under the Fourth Amendment. Because the Government does not advance an argument that the searches fall under an exception other than the border search exception, the Court deems any such argument waived.

violated . . . .").[9] Whether a search is reasonable "depends upon all of the circumstances surrounding the search and seizure and the nature of the search and seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). "The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Id.* (quotations and internal quotation marks omitted). "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

"The general rule is that 'warrantless searches are presumptively unreasonable.'" *Hyde*, 37 F.3d at 118 (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). There exist, however, "exceptions to the general rule which recognize that in certain limited situations the government's interest in conducting a search without a warrant outweighs the individual's privacy interest." *Id.* (citing *Montoya de Hernandez*, 473 U.S. at 537); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions.") (citations omitted). "Border searches are one such exception." *Hyde*, 37 F.3d at 118.

### B.    Border Search Exception

Border searches "have a unique status in constitutional law." *United States v. Ezeiruaku*, 936 F.2d 136, 142 (3d Cir. 1991) (citation omitted). The government's "authority to conduct routine searches and seizures at the border, without probable cause or a warrant," for the purpose of levying duties and intercepting contraband is well-recognized. *Montoya de Hernandez*, 473 U.S. at 537 (citing

---

[9] It is well-established that "[t]he Fourth Amendment applies in the U.S. Virgin Islands" pursuant to the Revised Organic Act of 1954. *United States v. Mathurin*, 561 F.3d 170, 174 n.3 (3d Cir. 2009) (citing 48 U.S.C. § 1561).

*United States v. Ramsey*, 431 U.S. 606, 616-617 (1977)).[10] Indeed, searches at the international border designed to "'protect [the United States] by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border . . . .'" *Hyde*, 37 F.3d at 119 (quoting *Ramsey*, 431 U.S. at 616). Further, individuals have more "limited justifiable expectations of privacy" at the nation's borders. *Id.* (quoting *Ramsey*, 431 U.S. at 623 n.17). "[A] port of entry is not a traveler's home." *Ramsey*, 431 U.S. at 618 (quoting *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 376 (1971)). "[N]ot only is the expectation of privacy less at the border than in the interior . . . [but] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 539-40.

Accordingly, courts have consistently applied the border search exception to searches occurring at the "physical boundaries of the nation" or their "functional equivalent" based on "the sovereign's historical right to police its borders and to examine persons and property entering the country." *United States v. Caminos*, 770 F.2d 361, 363-64 (3d Cir. 1985) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973)). Where those searches are routine, they "may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing." *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008) (citing *Montoya de Hernandez*, 473 U.S. at 538; *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir. 1985)). On the

---

[10] The Third Circuit in *Hyde* traced the origins of the border search exception to the "broad comprehensive powers [t]o regulate commerce with foreign Nations" granted to Congress by the U.S. Constitution. *Hyde*, 37 F.3d at 119 (internal citation and quotation marks omitted). Congress has exercised that authority "[s]ince the founding of our Republic" to "grant[] the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Id.* (quoting *Montoya de Hernandez*, 473 U.S. at 537).

other hand, "certain searches, classified as 'nonroutine,' require reasonable suspicion of wrongdoing to pass constitutional muster." *Id.* (citing *Montoya de Hernandez*, 473 U.S. at 541).[11]

### C. Customs Border Between the Mainland United States and the Virgin Islands

The Virgin Islands are an unincorporated territory of the United States. 48 U.S.C. § 1541(a); *Ballentine v. United States*, 486 F.3d 806, 809 (3d Cir. 2007). As an unincorporated territory, the Virgin Islands are "subject to the power of Congress under Article IV, Section 3 of the Constitution to make rules and regulations to govern the territory." *Hyde*, 37 F.3d at 121 (footnote omitted).[12]

After acquiring the Virgin Islands from Denmark in 1917, Congress exercised that power "to create a border between the Virgin Islands and the rest of the United States for customs purposes." *Id.* Specifically, by its Act of March 3, 1917, Congress provided for the levy of duties on "articles coming into the United States or its possessions" from the Virgin Islands at the rates "paid upon like articles imported from foreign countries." Act of Mar. 3, 1917, ch. 171, § 3, 39 Stat. 1133. Congress continues to provide for the levying of such duties today. 48 U.S.C. § 1394.[13] After the Virgin Islands were acquired by the United States, Congress also enacted legislation providing that "all laws

---

[11] To distinguish between routine and non-routine searches, "[c]ourts have focused on the privacy interest and the intrusiveness and indignity of the search." *Whitted*, 541 F.3d at 485 (citing *United States v. Cardenas*, 9 F.3d 1139, 1148 n.3 (5th Cir. 1993); *United States v. Vega–Barvo*, 729 F.2d 1341, 1344-46 (11th Cir. 1984)). The Third Circuit recognizes "patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search" as routine searches. *Id.* at 485-86 (citations omitted). Non-routine searches include "body cavity searches, strip searches, and x-ray examinations [of the body] . . . by virtue of their significant intrusion on an individual's privacy." *Id.* at 486 (citations omitted).

[12] Article IV, Section 3, Clause 2 of the Constitution provides, in pertinent part:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States.

[13] Title 48 U.S.C. § 1394 codifies revisions to the Act of March 3, 1917 passed by Congress in its Act of September 7, 1950, and maintains the imposition of duties on articles coming into the United States from the Virgin Islands.

imposing taxes" that existed in the Virgin Islands at the time of the acquisition of the islands by the United States from Denmark—including "customs laws and regulations"—would "continue in force and effect[.]" Act of Mar. 3, 1917, ch. 171, § 4 (codified at 48 U.S.C. § 1395). Thus, Danish customs laws in effect prior to the acquisition of the Virgin Islands by the United States—which related primarily to duties imposed on the importation of goods into the Virgin Islands—were preserved. These laws included a provision establishing an import duty of six percent of the value of goods imported into St. Thomas and St. John. Act No. 64-1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan, § 1 (Apr. 1, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. Imposition of the six percent duty was extended to goods imported into St. Croix through the Virgin Islands Organic Act of 1936. Act of June 22, 1936, ch. 699, § 36, 49 Stat. 1816 ("[A]ll laws concerning import duties and customs in the municipality of Saint Thomas and Saint John now in effect shall be in force and effect in and for the Virgin Islands."). In 1977, Congress specifically authorized the Virgin Islands Legislature to "impose on the importation of any article into the Virgin Islands for consumption therein a customs duty," provided that the duty does not exceed six percent of the value of that article. 48 U.S.C. § 1574(f).[14] Congress further delegated authority to the Secretary of the Treasury to "make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the customs laws in the Virgin Islands of the United States." 48 U.S.C. § 1406i. As such, since the acquisition of the Virgin Islands by the United States, Congress has maintained "a border between the Virgin Islands and the rest of the United States for customs purposes[.]" *Hyde*, 37 F.3d at 121.[15]

---

[14] Acting pursuant to that authority, the Virgin Islands Legislature has provided for the imposition of a customs duty of six percent of the value of "any article of foreign origin imported into the Virgin Islands . . . from within the United States Customs Zone." 33 V.I.C. § 525.

[15] The existence of a customs border between the continental United States and the Virgin Islands is further evidenced in the Tariff Act of 1930, which provides that the United States customs territory excludes the Virgin Islands. *Hyde*, 37 F.3d at 121 (quoting 19 U.S.C. §1401(h) ("The term 'United

## III.   DISCUSSION

In the instant cases, the Government relies on the Third Circuit's opinion in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), for the proposition that the border search exception which applies at the nation's international borders—i.e., permitting routine customs searches without a warrant, probable cause, or reasonable suspicion—applies in like fashion to searches occurring at the internal customs border between the continental United States and the Virgin Islands. The Government thus contends that the searches performed here were reasonable under the Fourth Amendment. (*Forde*, Dkt. No. 19 at 2-5).

Defendants contend that *Hyde* does not stand for the broad proposition that the border search exception applies to all searches conducted at the internal customs border between the continental United States and the Virgin Islands. Rather, Defendants argue that *Hyde*'s holding is limited to searches performed on persons and their luggage *leaving* the Virgin Islands and traveling to the mainland United States, and does not extend to searches of individuals and their luggage *arriving* in the Virgin Islands from the mainland United States. (*Forde*, Dkt. No. 14 at 2).

Defendants advance two primary arguments to distinguish the instant searches from those considered by the Third Circuit in *Hyde*. First, Defendants contend that—unlike the searches performed in *Hyde*—searches of persons and luggage arriving in the Virgin Islands from the mainland United States are not authorized by federal statute or regulation, and in fact are prohibited by a federal regulation providing that aircraft flying from the United States to the Virgin Islands are governed by provisions that apply on a flight within the United States. *Id.* at 6 (quoting 19 C.F.R. § 122.143(a)). Second, Defendants argue that—unlike in *Hyde*—the rationale underlying the border search exception weighs against application of the exception to the search of persons and luggage arriving

States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.")).

in the Virgin Islands because: (1) the United States has "little to no legitimate interest" in searches of persons and luggage arriving in the Virgin Islands from the continental United States, *id.* at 9-12; and (2) individuals have a greater reasonable expectation of privacy when crossing the customs border from the mainland United States into the Virgin Islands than they do when crossing the customs border into the mainland United States from the Virgin Islands, *id.* at 13. Defendants thus contend that, in light of these distinguishing factors, the searches performed in the instant cases were unreasonable under the Fourth Amendment.

### A. *Hyde* and Searches at the Internal Customs Border

Because the parties' arguments rely on competing interpretations of the Third Circuit's holding in *Hyde*, the Court begins with an analysis of that opinion.

In *Hyde*, three defendants received pat-down searches by Customs officers at the airport in St. Thomas as they were leaving the Virgin Islands for Miami, Florida. *Hyde*, 37 F.3d at 117. The defendants—charged with conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 963 and 952 and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1)—moved to suppress the cocaine seized as a result of the searches, alleging that the searches were unreasonable under the Fourth Amendment. The District Court suppressed the cocaine, finding that the Customs officers lacked probable cause to search the defendants, and that the search was therefore in violation of their right to be free from unreasonable searches and seizures under the Fourth Amendment. *Id.*

Reversing on appeal, the Third Circuit considered whether "routine customs searches of persons and their belongings" performed absent a warrant or probable cause "as they leave the Virgin Islands for the continental United States" are reasonable under the Fourth Amendment. *Id.* In concluding that such searches are reasonable for Fourth Amendment purposes, the *Hyde* Court focused on two factors.

The *Hyde* Court identified as one factor that Congress, through the Tariff Act of 1930, had "specifically authorized customs inspections when travelers enter the United States from the Virgin Islands and other United States possessions in the same manner as if the traveler had come from a foreign country." *Id.* at 121 (citing 19 U.S.C. § 1467 (providing that Customs officers may "cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged" from vessels originating "from a port or place in any Territory or possession of the United States" and arriving "at a port or place in the United States . . . ."))[16] The *Hyde* Court further noted that federal regulations specifically authorized the preclearance inspection conducted in that case by the Customs officer in the Virgin Islands. *Hyde*, 37 F.3d at 121 n.4 (citing 19 C.F.R. § 122.144(b) (providing with regard to flights from the Virgin Islands to the United States that "[w]hen aircraft are inspected by Customs in the U.S. Virgin Islands, the port director may order any supervision found necessary to protect the revenue and enforce the law administered by Customs"))[17] The Third Circuit equated that preclearance inspection to a border search, finding that "[a] preclearance inspection on flights bound directly for the United States is the same as a border search conducted immediately upon arrival in the United States and has the same permissible scope as any other border inspection." *Hyde*, 37 F.3d at 121 n.4 (citing *United States v. Walczak,* 783 F.2d 852, 855-56 (9th Cir. 1986)).

As a second factor, the *Hyde* Court considered the unique characteristics of the internal customs border between the continental United States and the Virgin Islands—a border created by the sovereign within its sovereign territory. *Id.* at 120. The Third Circuit recognized that "all of the

---

[16] Notably, while Section 1467 specifically addresses searches of vessels arriving in the continental United States or the Virgin Islands "from a *foreign* port or place or from a port or place in any *Territory or possession* of the United States," it does not address searches of vessels arriving in the Virgin Islands from the continental United States. 19 U.S.C. § 1467 (emphasis added).

[17] As previously noted, Congress delegated authority to the Secretary of the Treasury to "make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the customs laws in the Virgin Islands of the United States." 48 U.S.C. § 1406i. 19 C.F.R. § 122.144(b) is a regulation promulgated pursuant to that authority.

Supreme Court's border search cases" addressed "searches at an international boundary or its functional equivalent." *Id.* at 120. While the Supreme Court had established that "valid warrantless border searches may take place at the 'functional equivalent' of an international border or an 'extension' thereof," the *Hyde* Court noted that there was no contention that either of these principles was applicable to the case before it, where the search was performed at an internal customs border. *Id.* at 120 n.2 (citations omitted).[18] The Third Circuit further acknowledged that the internal border search situation "differs from the situations before the Supreme Court in its border search case[s] and, accordingly, that those cases do not directly support application of the border search exception to the search at issue." *Id.* at 122.

While recognizing these differences and acknowledging that "the authority of the United States to exclude people and goods at places other than its international borders" is subject to substantial constitutional restrictions, the *Hyde* Court observed that an internal customs border created by Congress between its "incorporated" and "unincorporated" territory shares "many of the characteristics of international borders." *Id.* at 120. Finding the rationale of the international border cases to be instructive, the Third Circuit concluded that it was appropriate to examine the

---

[18] The Supreme Court has recognized that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City" would be characterized as a search occurring at the "functional equivalent" of the international border. *Almeida-Sanchez*, 413 U.S. at 273. "An extended border search takes place *after* the first point in time when the person or package might practicably have been stopped and searched." *Caminos*, 770 F.2d at 364 (internal citation omitted). "It requires the same showing as a border search, but because it entails a greater intrusion on legitimate expectations of privacy, it also requires a showing of 'reasonable suspicion.'" *Id.*

The Court recognizes that it has previously described *Hyde* as establishing that "the Henry E. Rohlsen airport is the 'functional equivalent' of an international border for purposes of the Fourth Amendment analysis." *United States v. Henry*, 2018 WL 547266, at *4 (D.V.I. Jan. 23, 2018). The more accurate description of *Hyde's* holding, however, is that the internal customs border between the mainland United States and the Virgin Islands is *treated* as the equivalent of an international border for purposes of the border search exception as applied to individuals and luggage departing the Virgin Islands for the mainland United States. Because *Henry* involved a flight departing the Virgin Islands for the mainland United States, this refinement of the Court's description of *Hyde's* holding does not affect the Court's ruling in that case.

reasonableness of searches of individuals and their belongings departing the Virgin Islands for the continental United States by considering those interests typically associated with searches occurring at the nation's international borders—i.e., the United States' sovereign authority to police its borders, including its exercise thereof, and the individual's diminished privacy interests at such borders. *Id.* at 122.

After analogizing Congress' "broad power to regulate commerce between the United States and its unincorporated territories," with Congress' "broad authority to regulate commerce with foreign nations," *id*. at 122, the *Hyde* Court proceeded to analyze the internal customs border by considering the interests associated with the international border. In this regard, the Third Circuit observed:

> Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of [the Virgin Islands] customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems at international borders. Thus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this "internal" border to be little different from its interest in such searches at its international borders.

*Id.* As to the individual's privacy interests, the Third Circuit dismissed the idea that the defendants' "reasonable expectations of individual privacy" under the circumstances were "materially greater than the reasonable privacy expectations of travelers at an international border." *Id.* The rejection of that proposition was deemed especially warranted given that customs searches had been "consistently conducted at the border between the Virgin Islands and the mainland since the United States acquired the Virgin Islands," and there was "sufficiently public knowledge of the distinctive status of the Virgin Islands to alert [] travelers to the possibility of border inquiries not experienced at state lines." *Id.* The *Hyde* Court thus concluded that the balance of these interests weighed in the government's favor for purposes of the Fourth Amendment analysis. *Id.*

Having considered both the explicit federal authorization for the searches and the governmental and individual interests implicated by the searches at the internal customs border, the Third Circuit in *Hyde* held that "the routine customs searches of persons and their belongings without probable cause as they leave the Virgin Islands for the United States are not unreasonable under the Fourth Amendment." *Id.* at 117, 122.[19]

In the Court's view, *Hyde* does not stand for the broad proposition that the border search exception is mechanically applied to searches occurring at the internal customs border between the mainland United States and the Virgin Islands, such that any routine customs search performed at the border is exempt from the requirement of a warrant, probable cause, or reasonable suspicion. Instead, *Hyde* stands for the more limited proposition that, because the internal customs border shares many of the characteristics of an international border, it is appropriate to examine and weigh the United States' interest in regulating the movement of people and goods across the internal customs border and the individual's expectations of privacy at that border—considerations typically associated with searches occurring at the nation's international borders—in determining whether a search conducted at the internal customs border is reasonable under the Fourth Amendment. The searches in *Hyde* were deemed to be reasonable in light of those factors *and* in light of Congress' specific authorization of the search of individuals and their belongings arriving in the United States from the Virgin Islands. This authorization was provided through both statute and federal regulations promulgated pursuant to congressional delegation of authority. In other words, while the characteristics of the internal

---

[19] Although *Hyde*'s holding is stated in terms of routine customs searches of persons and their belongings departing the Virgin Islands for the continental United States performed without *probable cause*, the Court notes that the government conceded in *Hyde* that the Customs officer "lacked reasonable suspicion of criminal activity when she conducted the searches," *id.* at 118, and the Third Circuit framed the issue before it as whether a search could be conducted "in the absence of any degree of suspicion that the individual is engaged in wrongdoing." *Id.* The Court thus interprets *Hyde*'s holding as applying to routine customs searches of persons and their belongings departing the Virgin Islands for the continental United States performed without probable cause *or* reasonable suspicion.

customs border are such that the governmental and individual privacy interests implicated by searches at that border *may* support application of the border search exception—as found in *Hyde* with respect to individuals and their belongings leaving the Virgin Islands for the continental United States—federal authorization for those searches must exist to render them reasonable under the Fourth Amendment.

The Court's interpretation of *Hyde*—and, in particular, the view that the reasonableness of a search occurring at the internal customs border must be tied to federal authorization for the search—stems from the preeminence of Congress' role at each step of the border search analysis conducted by the Third Circuit in *Hyde*. The *Hyde* Court first found that Congress had the authority to create a customs border. *Id.* at 121 ("[I]t is clear that Congress has the authority to create a border for customs [purposes] between the Virgin Islands and the rest of the country."). It then found that Congress had exercised its authority "to create a border between the Virgin Islands and the rest of the United States for customs purposes." *Id.* ("Congress provided that '[t]here shall be levied, collected, and paid upon all articles coming into the United States or its possessions from the Virgin Islands the rates of duty and internal-revenue taxes which are required to be levied, collected, and paid upon like articles imported from foreign countries.'") (quoting Act of March 3, 1917, § 3 (codified at 48 U.S.C. § 1394)). The Third Circuit in *Hyde* then went on to find that "Congress has specifically authorized customs inspections when travelers enter the United States from the Virgin Islands . . . in the same manner as if the traveler had come from a foreign country." *Id.* (citing 19 U.S.C. § 1467; 19 C.F.R. § 122.144(b)).[20] The *Hyde* Court concluded:

_____

[20] The Court notes that the term "vessel" as used in 19 U.S.C. § 1467 does *not* include aircraft—a point that was not addressed by the Third Circuit in *Hyde*. *See* 19 U.S.C. § 1401(a) ("The word 'vessel' includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft."). However, federal regulations provide broadly that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer." 19 C.F.R. § 162.6. Thus, in addition to the statutory authority contained in the Tariff Act of 1930 for

> [S]ince the acquisition of the Virgin Islands, Congress has consistently asserted its
> authority to impose a border between the Virgin Islands and the rest of the United
> States for customs purposes *and has authorized customs officials to search vessels and*
> *goods passing between the Virgin Islands and the rest of the country.*

*Id.* (emphasis added).

The need for federal authorization also follows from the unique characteristics of the internal customs border and the constitutional rights of individuals that are implicated. Although the internal customs border shares "many characteristics of [an] international[] border," *Hyde*, 37 F.3d at 120, it also possesses pertinent distinguishing characteristics. Unlike the international border, the same sovereign controls on both sides of the internal customs border, and likewise, the protections of the Fourth Amendment apply on both sides of the internal customs border. Thus, while searches at the nation's international borders are said to be "reasonable simply by virtue of the fact that they occur at the border," *Ramsey*, 431 U.S. at 616,[21] the notable differences between the international border and the internal customs border support the conclusion that searches at the internal customs border

---

the search of vessels and their contents arriving in the continental United States from the Virgin Islands, 14 U.S.C. § 1467, and the federal regulation providing for the type of preclearance inspection in the Virgin Islands that occurred in *Hyde*, 19 C.F.R. § 122.144(b), the searches in *Hyde* of travelers boarding an aircraft in the Virgin Islands bound for the continental United States were specifically authorized by the federal regulatory provision in 19 C.F.R. § 162.6.

[21] Despite this broad language employed by the Supreme Court in *Ramsey*, it is worth noting that federal courts often consider whether a challenged search was conducted pursuant to congressional authorization even in the international border context. In fact, the *Ramsey* Court itself began its analysis with an examination of whether a search of international mail arriving in the United States was authorized by Congress. *Ramsey*, 431 U.S at 611-12. Because the *Ramsey* Court concluded that the search *was* authorized by Congress, it left open the question "whether Congress conceived the statute as a necessary precondition to the validity of the search or whether it was viewed, instead, as a limitation on otherwise existing authority of the Executive [to conduct searches]." *Id.* at 615.

The Fifth Circuit, relying on *Ramsey*, has specifically "adopted a two-part inquiry in order to determine the constitutionality of a warrantless search," including those occurring at the international border. *United States v. Berisha*, 925 F.2d 791, 793 (5th Cir. 1991) (citation omitted). The two-part inquiry considers: (1) whether the search has been authorized by statute, and (2) whether the search, "as authorized, was reasonable within the meaning of the fourth amendment." *Id.* The propriety of the Fifth Circuit's approach has, however, been questioned by the D.C. Circuit. *United States v. Gonzalez*, 875 F.2d 875, 877–78 (D.C. Cir. 1989).

must be authorized by federal statute or regulation to be rendered reasonable for Fourth Amendment purposes.

In sum, the Court understands *Hyde* to establish that a warrantless and suspicionless routine customs search at the internal customs border between the United States and the Virgin Islands *may* be reasonable for Fourth Amendment purposes if: (1) the search is federally authorized; and (2) the United States' interest in regulating the flow of persons and effects across the border outweighs the individual's reasonable expectation of privacy at the border. Accordingly, the Court will consider whether those conditions were present here.

### B.    Federal Authorization

The Government concedes that there is no federal statute or regulation specifically authorizing Customs officers to conduct searches of individuals and luggage entering the Virgin Islands from the continental United States. (*Forde*, Dkt. No. 48 at 7). Instead, it contends that the search authority in the instant cases is derived from the authority that Congress vested with the Secretary of the Treasury to administer the customs laws of the Virgin Islands. *Id.* at 7-8.

As previously noted, after establishing the internal customs border between the continental United States and the Virgin Islands, Congress authorized the Secretary of the Treasury to "make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the customs laws in the Virgin Islands of the United States." 48 U.S.C. § 1406i. Pursuant to that authority, the Secretary of the Treasury "administers the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection." 19 C.F.R. § 7.2(c).[22] In turn, the

---

[22] With regard to the importation of goods into the Virgin Islands, 19 C.F.R. § 7.2(c) provides that "the importation of goods into the U.S. Virgin Islands is governed by Virgin Islands laws; however, in situations where there is no applicable Virgin Islands law or no U.S. law specifically made applicable to the Virgin Islands, U.S. laws and regulations shall be used as a guide and be complied with as nearly as possible."

Virgin Islands Legislature—acting pursuant to its congressional authorization to impose a customs duty on articles imported into the Virgin Islands, *see* 48 U.S.C. § 1574(f)—has provided for the imposition of a customs duty of six percent of the value of "any article of foreign origin imported into the Virgin Islands . . . from within the United States Customs Zone." 33 V.I.C. § 525. Thus, Virgin Islands customs laws provide for the levying of a duty on goods imported into the Virgin Islands, while the administration of those customs laws is accomplished through CBP. 19 C.F.R. § 7.2(c).

The Government points to a variety of statutes and regulations that purportedly support its contention that the Secretary of the Treasury—acting through CBP and pursuant to its authority to "enforce the Virgin Islands customs laws," (*Forde*, Dkt. No. 48 at 8)—was authorized to conduct the searches at issue here. However, virtually none of the authorities contain enforcement provisions, let alone authorize or even reference the types of searches conducted here.[23] The Government seems to suggest that the existence of a regulation that states that the "Secretary of the Treasury administers

---

[23] By way of example, two of the statutes the Government relies on establish regulations on the importation of firearms into the Virgin Islands, and do not contain any specific authorization for the inspection or search of individuals or their belongings to enforce those regulations. *See* 23 V.I.C. § 467a ("[W]hoever, without being licensed in accordance with this chapter, imports, carries, or brings any firearm or ammunition into the Virgin Islands and fails to report to the Commissioner as required by section 470 of this chapter shall be punished by a fine of not less than $50,000 or imprisonment for a minimum of 25 years or both fine."); 23 V.I.C. § 470(a) ("Any person upon entering the Virgin Islands and bringing any firearm or ammunition shall declare all firearms and ammunition to the Commissioner or the Commissioner's designee immediately upon arrival to any port of entry and shall furnish a complete description of all firearms and ammunition brought into the Virgin Islands."). A third statute—which is contained within a provision of the Danish law that was preserved following the United States' acquisition of the Virgin Islands—also relates to the importation of firearms, and similarly lacks any specific authorization for searches. Act No. 64-1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan, § 3 (Apr. 1, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936 ("Firearms, ammunition, inflammable and explosive substances, can only be imported under compliance with such rules of control which the Government prescribes."). A fourth statute—also contained within a provision of the preserved Danish law— establishes procedures for determining the "correctness of the value [of goods] reported" following a "written demand from the Customs House[,]" and provides that the "Customs Department is . . . always entitled to make a detailed examination of the goods." Act No. 64-1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan, § 5 (Apr. 1, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. The Court does not find that the Government's cause is advanced by any of these statutory provisions.

the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection" and that "[t]he importation of goods into the U.S. Virgin Islands is governed by Virgin Islands law," 19 C.F.R. § 7.2(c), means that authorization for the search of individuals and luggage arriving in the Virgin Islands may be derived from Virgin Islands law, rather than federal law. (*Forde*, Dkt. No. 48 at 7-10). In this regard, the Government contends that the Virgin Islands Legislature has provided such authorization through 33 V.I.C. § 50(b).

Title 33 of the Virgin Islands Code codifies Virgin Islands taxation and finance laws. Section 50 is contained within Subtitle 1, Part I, Chapter 3 of Title 33, which addresses "Miscellaneous Excise Taxes; Gross Receipts Taxes; Wharfage and Docking, Etc., Fees." The provision itself is titled "Certain United States employees to aid in assessment and collection," and states:

> (a) The employees of the United States Customs Department and the United States Postal Service are hereby authorized, pursuant to [48 U.S.C. § 1395] to assist the appropriate officials of the Government of the United States Virgin Islands in the assessment and collection of the excise taxes herein imposed.
>
> (b) Any customs officer may at any time go on board any vessel or aircraft arriving in the Virgin Islands from any place outside thereof and examine, inspect and search the vessel or aircraft and any person, baggage, package, or cargo on board, or which is being, or has been, unladen from such vessel or aircraft.

33 V.I.C. § 50. The Government maintains that Subsection (b) of 33 V.I.C. § 50 provides the necessary authorization for CBP officers to perform the searches that occurred in the instant cases.

Defendants claim that the Government's reliance on 33 V.I.C. § 50(b) is misplaced. Pointing to Subsection (a), they argue that the statute does not authorize CBP to conduct searches at the internal customs border for purposes of levying *customs* duties, but rather relates to the collection of *excise* taxes.[24] They therefore contend that the statute does not authorize the searches that occurred in the

---

[24] An excise tax is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity . . . ." EXCISE, Black's Law Dictionary (10th ed. 2014). A customs duty, on the other hand, is "[a] tax levied on an imported or exported commodity." DUTY, Black's

instant cases, because there is no evidence in the record that the searches were performed for purposes of assessing excise taxes. (*Forde*, Dkt. No. 52 at 11).

The Court agrees that a plain reading of 33 V.I.C. § 50 establishes that it is directed toward the collection of excise taxes. Subsection (a) of Section 50 specifically addresses the "assessment and collection of the excise taxes herein imposed." The phrase "the excise taxes herein imposed" is naturally read as a reference to the excise taxes imposed pursuant to 33 V.I.C. § 42, which is also contained in Subtitle 1, Part I, Chapter 3 of Title 33, and which provides for the collection of "excise tax[es] on all articles, goods, merchandise or commodities manufactured in or brought into the Virgin Islands" other than those specifically exempted by statute. The search authority granted to customs officers by Subsection (b) of Section 50 is plainly understood to refer back to the assessment and collection of excise taxes provided in Subsection (a). Customs duties are codified separately at Chapter 12 of Title 33 of the Virgin Islands Code.[25]

In any event, the Government's reliance on this local Virgin Islands statute raises a more pressing concern. Even assuming that 33 V.I.C. § 50(b) could be read to authorize CBP officers to conduct warrantless and suspicionless searches of persons and their luggage arriving in the Virgin Islands from the continental United States for purposes of assessing customs duties, a more fundamental question remains. Can a Virgin Islands statute authorizing warrantless and suspicionless

---

Law Dictionary (10th ed. 2014). As described below, however, the Virgin Islands imposes both excise taxes *and* customs duties, separately, on articles brought into the Virgin Islands.

[25] Although there has been no contention that the CBP officers in the instant cases performed searches to assess excise taxes, it is not entirely clear that the absence of a specific reference to the collection of customs duties in 33 V.I.C. § 50(b) would preclude the Government from relying on that statute as the source of the CBP officers' search authority *if* the Virgin Islands statute was otherwise an appropriate means by which to authorize warrantless, suspicionless searches at the internal customs border. Because the Court need not decide this issue in light of its conclusion that the Virgin Islands statute is insufficient to render the searches reasonable for Fourth Amendment purposes, the Court leaves open the question whether the searches that occurred here would fall within the broad scope of 33 V.I.C. § 50(b)—regardless of whether the CBP officers' subjective intent in performing the searches was the assessment of customs duties as opposed to excise taxes.

searches of individuals and effects arriving in the Virgin Islands from the United States substitute for the explicit federal authorization relied on in *Hyde* for purposes of rendering such searches reasonable under the Fourth Amendment? The Court concludes that a Virgin Islands statute is insufficient to render such searches reasonable.

First, it is not evident to the Court that Congress has vested authority in the Virgin Islands Legislature to provide for the searches of persons and their luggage arriving in the Virgin Islands from the continental United States for purposes of enforcing Virgin Islands customs laws. Rather, Congress has vested the authority to create such regulations in the Secretary of the Treasury. 48 U.S.C. § 1406i. Yet the Government has been unable to identify any federal regulation providing for the search of persons and their luggage *arriving* in the Virgin Islands from the continental United States. Indeed, the federal regulation proffered regarding flights arriving in the Virgin Islands from the United States suggests the opposite: "Aircraft on flights from the U.S. to the U.S. Virgin Islands are governed by the provisions . . . that apply to aircraft on a flight within the U.S." 19 C.F.R. § 122.143(a). This stands in sharp contrast to federal regulations regarding flights *departing* from the Virgin Islands to the continental United States. One such regulation provides that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer." 19 C.F.R. § 162.6. Another such regulation provides that "[a]ircraft departing from the U.S. Virgin Islands for the U.S. are governed by the provisions . . . that apply to aircraft arriving in the U.S. from a foreign area," 19 C.F.R. § 122.144(a)(2), and authorizes the port director to "order any supervision found necessary" with respect to such aircraft "to protect the revenue and enforce the laws administered by Customs," 19 C.F.R. § 122.144(b). Thus, there is a discernible difference between the federal regulatory directives for flights arriving into and those departing from the Virgin Islands.

Second, it certainly cannot be the case that the mere existence of the Virgin Islands statute at issue serves to negate the applicability of the Fourth Amendment as made applicable to the Virgin Islands by the Revised Organic Act of 1954. Instead, tying the validity of warrantless and suspicionless searches occurring at the internal customs border to *federal* authorization is consistent with the underlying rationale of the border search exception as applied by the Third Circuit in *Hyde* to searches occurring at the internal Virgin Islands customs border. If Congress, by statute or through federal regulations promulgated pursuant to congressional delegation of authority, has deemed it necessary to grant specific authorization for the search of persons and effects crossing the internal customs border to protect its sovereign interests in controlling its borders—as it has with regard to persons and effects arriving in the United States from the Virgin Islands—then such searches derive their reasonableness for Fourth Amendment purposes from that federal authorization. The Court finds no basis in the record or in the law for concluding that a decision by the Virgin Islands Legislature to authorize warrantless and suspicionless searches at the internal customs border somehow substitutes for a determination by Congress that those searches are necessary to safeguard the United States' sovereign interests.[26] Therefore, even if 33 V.I.C. § 50(b) could be read to support the customs searches that occurred in the instant cases, such authorization from the Virgin Islands Legislature would not render the searches reasonable for Fourth Amendment purposes.[27]

---

[26] The circumstances considered by the Supreme Court in *Torres v. Com. of Puerto Rico*, 442 U.S. 465 (1979), are distinguishable from those of the instant cases because—unlike in Puerto Rico— Congress has created a customs border between the mainland United States and the Virgin Islands. Nonetheless, the Court's conclusion that a Virgin Islands law cannot substitute for a determination by Congress that warrantless and suspicionless searches at the internal customs border are necessary to safeguard the United States' sovereign interests is reinforced by the Supreme Court's recognition in *Torres* that Puerto Rico lacked "the sovereign authority to prohibit entry into its territory . . . ." *Id.* at 473. Here, application of the border search exception to searches occurring at the internal customs border between the mainland United States and the Virgin Islands must rest on the *United States'* exercise of its sovereign authority to regulate that border.

[27] Notwithstanding what may appear to be the odd circumstance of having the border search exception apply in one direction across the internal customs border, but not the other, this Court's role is not to

In sum, there is no evidence before the Court that the warrantless and suspicionless searches of individuals and their luggage arriving in the Virgin Islands on flights from the continental United States have been authorized by federal law or regulation. Because the Court finds that federal authorization is necessary to render such searches reasonable under the Fourth Amendment, it concludes that the warrantless and suspicionless searches performed by CBP officers in the instant cases were unreasonable for Fourth Amendment purposes.

C.      **Balance of Interests**

The Court writes briefly to make clear that its conclusion that the searches performed here were unreasonable under the Fourth Amendment is *not* based on a finding—as Defendants have argued—that the United States has "little to no legitimate interest" in searches of individuals and luggage arriving in the Virgin Islands from the mainland United States.  The Court notes that, in the context of the border search exception as applied to searches occurring at the international border, the Third Circuit has held that "the traditional rationale for the border search exception applies . . . in the *outgoing* border search context." *Ezeiruaku*, 936 F.2d at 143 (emphasis added). As observed by the Ninth Circuit:

> [B]oth incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.

*United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976). Thus, the legitimate interests that the United States maintains in regulating the persons and effects entering the United States across the internal customs border in the Virgin Islands may also justify regulation of the persons and effects

---

legislate from the bench, but to interpret the law as passed by Congress. *See Kendall v. Russell*, 572 F.3d 126, 133 (3d Cir. 2009).

departing the United States across that same customs border. Indeed, Congress has explicitly recognized that it maintains such interests. *See, e.g.*, 21 U.S.C. § 955 (providing that it is unlawful for any person to "bring or possess [a controlled substance] on board any vessel or aircraft, or on board any vehicle of a carrier, arriving in *or departing from* the United States *or the customs territory of the United States*").[28] Nonetheless, because the Court concludes based on its analysis of *Hyde* that warrantless and suspicionless searches at the internal customs border are reasonable for Fourth Amendment purposes *only if* those searches are federally authorized—and because the searches in the instant cases were not so authorized—the Court has determined that the searches here were unreasonable under the Fourth Amendment.

### D.   Good Faith Exception

The Court's finding that the searches at issue here violated Defendants' right to be free from unreasonable searches under the Fourth Amendment does not conclude its analysis. The Court must now determine whether the remedy sought by Defendants—suppression of the tangible evidence discovered through the searches—is appropriate under the circumstances.

"[W]hen the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial." *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (citing *Herring v. United States,* 555 U.S. 135, 139 (2009)). "Whether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's

---

[28] Similarly, although courts have observed that Customs officials have tended to police the internal customs border more rigorously with respect to individuals and effects entering the continental United States from the Virgin Islands than vice versa, *see, e.g., United States v. Herbert*, 886 F. Supp. 524, 525 n.2 (D.V.I. 1995) (noting that "the United States Customs Service systematically patrols the [customs] border in only one direction"), the Court is not persuaded that an individual's reasonable expectation of privacy at the internal customs border is necessarily greater as he arrives in the Virgin Islands from the mainland United States than it is as he departs the Virgin Islands for the mainland United States.

Fourth Amendment rights." *Id.* at 170 (citing *Hudson v. Michigan,* 547 U.S. 586, 591-92 (2006)).

"The [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations," *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (citations omitted), and specifically to "deter police misconduct." *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (citing *United States v. Leon*, 468 U.S. 897, 919-20 (1984)). Thus, the suppression of evidence obtained as a result of an illegal search is not a constitutional right, but rather "a judicially created means of effectuating the rights secured by the Fourth Amendment." *Katzin*, 796 F.3d at 170 (quoting *Stone v. Powell*, 528 U.S. 465, 482 (1976)). Application of the exclusionary rule is reserved for those cases in which its purpose of "appreciably deter[ring] governmental violations of the Fourth Amendment" is served. *Id.* (citations omitted).

"[T]o warrant exclusion, the deterrent value of suppression must overcome the resulting social costs" associated with suppressing what is often "reliable, trustworthy evidence." *Id.* at 171 (quoting *Davis*, 564 U.S. at 229). The "culpability of the law enforcement conduct at issue" is a pivotal factor in the balancing of these concerns. *Davis*, 564 U.S. at 238 (quoting *Herring*, 555 U.S. at 143) (quotation marks omitted). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (internal quotation marks omitted). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force . . . ." *Id.* (internal citations and quotation marks omitted). Accordingly, where law enforcement acts "with a good faith belief in the lawfulness of their conduct that was objectively reasonable[,] . . . suppression is unwarranted." *Katzin*, 769 F.3d at 182 (quotation and internal quotations marks omitted). On the other hand, where law enforcement "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, suppression is warranted." *Id.* (quoting

*Illinois v. Krull*, 480 U.S. 340, 348-49 (1987)) (internal quotation marks omitted). The good faith inquiry is, however, "'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon,* 468 U.S. at 922 n.23). While "these circumstances frequently include a particular officer's knowledge and experience, [] that does not make the test any more subjective than the one for probable cause, which looks to an officer's knowledge and experience, [] but not his subjective intent." *Id.* (quotations omitted).

In light of the circumstances in the instant cases, the Court finds that "a reasonably well trained officer" would not have known, nor should have been expected to know, that warrantless and suspicionless searches of luggage at the Henry E. Rohlsen airport from flights arriving in the Virgin Islands from the continental United States were illegal. During the suppression hearing held in *Barconey*, Officer Anderson testified that, per his understanding, CBP officers are permitted to search luggage arriving in the Virgin Islands from the United States because such searches are performed at the customs border.[29]

During the subsequent suppression hearing held in *Lopez*, Officer Anderson once again testified regarding his understanding that CBP officers have authority under the border search exception to perform searches of individuals and luggage arriving in the Virgin Islands from the continental United States. (*Lopez*, Dkt. No. 96 at 15:10-16:2). The testimony was as follows:

> Q: Do you believe you have any authority to search incoming from Miami to St. Croix?
> A: Yes, I do.
> Q: And why do you have that opinion?
> A: Well, we've been told that, 19 U.S.C. also states that we have authority. My supervisors told me that. We always have been taught or given instructions to do so.

---

[29] *See Barconey* (Dkt. No. 85 at 19:16-21) ("Q: Now, you did not have Ms. Barconey's, who you identified in the courtroom, you did not have her consent to search any of those four bags, correct? A: It's a border search. Border search, so we do not need her consent to search the bags."); *see also id.* at 22:9-13 ("Q: Okay. Now, I think I know why, but at no time you didn't get a warrant to search any of this luggage? A: Like I said before, it's a border search and we don't need a warrant.").

Q: Is that your understanding? Is that consistent with the training that you've received?
A: Yes, sir.
Q: How long have you been operating in that scope of authority?
A: Ever since I've been in Customs, 20 years now.

*Id.* at 16:1-15. Officer Anderson also testified that his understanding of CBP officers' search authority arose from his participation in an agency training administered by an attorney from Puerto Rico on the application of the border search exception in the Virgin Islands. *Id.* at 15:2-16:2.[30] Then, during the final suppression hearing held in *Forde*, Officer Anderson similarly testified that he understood from on-the-job training he had received from attorneys from Puerto Rico that CBP officers have authority to conduct searches of passengers and their personal belongings as they arrive in the Virgin Islands from the continental United States. (*Forde*, Dkt. No. 46 at 15:18-16:8).[31]

Officer Anderson's understanding—based on his agency training and instructions—that the border search exception applied to searches of individuals and luggage arriving in the Virgin Islands from the continental United States was consistent with the legal authority that existed over his 20-year Customs career, as well as at the time he performed the searches in the instant cases. For example, in *United States v. Chabot*, 531 F. Supp. 1063 (D.V.I. 1982)—a case decided 37 years ago—a defendant moved to suppress marijuana discovered following the warrantless search of a small airplane he flew from Puerto Rico to St. Croix on the ground that the search performed by Customs officers on St. Croix did not constitute a "border search," and that a warrant was therefore required.

---

[30] Officer Anderson initially testified that this training had occurred "a year, year and a half ago, something like that." *Id.* at 15:4-7. He later testified that it had occurred "[s]everal years ago." *Id.* at 32:8

[31] Defendants argue that Officer Anderson's testimony regarding the on-the-job training he received should not be credited because he testified during the *Lopez* hearing that the training had occurred approximately one year earlier but testified during the *Forde* hearing that the training had occurred "three or four years ago." (*Forde*, Dkt. No. 52 at 16). As previously noted, however, Officer Anderson testified on cross-examination during the *Lopez* suppression hearing that the training had occurred "several years" earlier. In any event, the Court does not find that any minor discrepancy in Officer Anderson's recollection of when the training occurred would justify discrediting his testimony.

*Id.* at 1068-69. The District Court—discussing much of the same historical background later considered by the Third Circuit in *Hyde*—observed that the Virgin Islands is a "'customs zone' separate and apart from the United States, Puerto Rico and other U.S. possessions[.]" It therefore determined that the "island of St. Croix constitutes a 'border' or its functional equivalent within the meaning of the 'border search' exception to the warrant requirement," and thus that no warrant was required for the search of the defendant's plane. *Id.* at 1069. Although the District Court found that the Customs officials had probable cause to search the plane, it noted that "[a]t a border, customs agents need not have a reasonable or articulable suspicion that criminal activity is involved to stop a person who has traveled from a foreign point, examine his or her credentials and search luggage and personal effects for contraband." *Id.*

In the wake of *Hyde*, various courts noted that the border search exception was applicable to searches of individuals and their belongings arriving in the Virgin Islands from the continental United States. In *United States v. Herbert*, 886 F. Supp. 524, 525 (D.V.I. 1995), the District Court recognized the general understanding that "warrantless border searches apply to travel into the customs zone of the Virgin Islands from elsewhere in the geographic United States," although it also noted that "the United States Customs Service systematically patrols the border in only one direction." *Id.* at 525 n.2 (citing *Chabot,* 531 F. Supp. at 1069). In *United States v. Mark*, 2007 WL 2669576 (D.V.I. Sept. 5, 2007), the District Court—again relying on *Chabot*—found the border search exception applicable to the search of a defendant's luggage as he was "*en route* to St. Thomas" from Atlanta, Georgia. *Id.* at *9. Similarly, a panel sitting as the Appellate Division of the District Court in *David v. Gov't of Virgin Islands*, 2009 WL 1872678 (D.V.I. June 25, 2009), found that an individual "is considered to have crossed a border within the meaning of the border search exception to the warrant requirement" in rejecting a challenge to the search of a defendant's luggage as he arrived in St. Thomas from Atlanta, Georgia. *Id.* at 5; *see also Rivera*, 2014 WL 5395792 at *7 (noting in dicta that

"CBP agents could legally search [passengers arriving in the Virgin Islands from the continental United States] because they [] crossed a border").[32]

This Court has parted ways with these prior opinions based on its conclusion that warrantless and suspicionless searches of individuals and their luggage occurring at the internal customs border as they arrive in the Virgin Islands from the continental United States must be federally authorized to be reasonable under the Fourth Amendment, and its finding that no such federal authorization exists. That conclusion, however, does not make unreasonable Officer Anderson's understanding—based on the agency training that he received, including from attorneys—that the searches performed in the instant cases were permissible. To the contrary, the Court finds that a "reasonably well trained officer" in Officer Anderson's position at the time the searches were performed would be justified in his understanding that the border search exception applied to searches of individuals and luggage arriving in the Virgin Islands from the continental United States. This is especially so given that the existing legal authority for 36 years, up through the searches at issue here, was consistent with the training and instructions that Officer Anderson had received and upon which he relied.[33]

To be sure, the existing legal authority did not consist of binding appellate authority, as no such appellate authority existed. *See Davis*, 564 U.S. at 241 (holding that the good faith exception to

---

[32] Indeed, it was not until *after* Officer Anderson conducted the searches in the instant cases that any legal authority casting doubt on the application of the border search exception to searches of persons and effects arriving in the Virgin Islands from the continental United States came into existence. *See United States v. Baxter*, 2018 WL 6173880, at *11-16 (D.V.I. Nov. 26, 2018). This arose in a context involving packages inspected by CBP officers that arrived at the airport in St. Thomas by Priority Mail.

[33] The Court rejects Defendants' argument that the Court has "insufficient information" upon which to determine whether Officer Anderson's understanding regarding the application of the border search exception to the searches he conducted was reasonable because he was unable to point to specific case law or statutes supporting his understanding. The Court finds Officer Anderson's inability to recite specific legal authority of no consequence. Officer Anderson's articulation of his understanding and from whence he obtained that understanding, together with the Court's review of the existing legal authority, provides sufficient information for the Court to assess the reasonableness of Officer Anderson's understanding.

the exclusionary rule applies where "binding appellate precedent specifically *authorizes* a particular police practice") (emphasis in original). However, the Third Circuit has observed that "[t]o exclude evidence simply because law enforcement fell short of relying on binding appellate precedent would impermissibly exceed the Supreme Court's mandate that suppression should occur in only 'unusual' circumstances: when it 'further[s] the purposes of the exclusionary rule.'" *Katzin*, 769 F.3d at 177-78 (quoting *Leon*, 468 U.S. at 918). Rather, the "more fundamental inquiry" is the one the Court has undertaken herein: "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal under all of the circumstances," *United States v. Vasquez-Algarin*, 821 F.3d 467, 483 (3d Cir. 2016) (quotations and internal quotation marks omitted)—circumstances which here include legal authority, albeit at the district court level.

In sum, under the circumstances presented in the instant cases, the Court concludes that a reasonably well trained officer would *not* have known, nor should have been expected to know, that the warrantless and suspicionless searches of luggage performed at the Henry E. Rohlsen airport from flights arriving in the Virgin Islands from the continental United States were illegal.[34] As such, the Court finds that CBP officers "acted with a good faith belief in the lawfulness of their conduct that was objectively reasonable" when they performed the searches. *Katzin*, 769 F.3d at 182.[35] These are

---

[34] The Court rejects the argument advanced by Defendant Forde that Officer Anderson was no longer acting on an objectively reasonable good-faith belief that the search he performed was lawful by the time he conducted the search of Defendant Forde's luggage on February 7, 2018 because he had been "put on notice" that this search authority was being challenged by defendants in other cases. (*Forde*, Dkt. No. 52 at 15-16). The fact that the application of the border search exception to searches of individuals and luggage arriving in the Virgin Islands from the United States was being challenged by other defendants does not undermine Officer Anderson's continued reliance on his training and instructions, which reflected the existing legal authority at the time.

[35] Notwithstanding that the record evidence indicates that the searches here were performed for the purpose of detecting contraband as opposed to imposing customs duties, the analysis remains unchanged. The border search exception as normally applied permits Customs officers to perform routine customs searches "to regulate the collection of duties *and* to prevent the introduction of contraband[.]" *Montoya de Hernandez*, 473 U.S. at 537 (emphasis added).

not cases, therefore, in which application of the exclusionary rule would achieve its purpose of "appreciably deter[ring] governmental violations of the Fourth Amendment," *id.* at 170, because there is no law enforcement misconduct to deter. Accordingly, because CBP officers performed routine customs searches of Defendants' luggage acting under an objectively reasonable good-faith belief that the searches were lawful, the good faith exception to the exclusionary rule applies in the instant cases.[36]

---

[36] To the extent Defendants have argued that an x-ray examination constitutes a non-routine customs search, the Court rejects that argument. While an x-ray examination of a *person* can be nonroutine because of its "significant intrusion on an individual's privacy," *Whitted*, 541 F.3d at 486, an x-ray examination of luggage is not. *See United States v. Lawson*, 461 F.3d 697, 701-02 (6th Cir. 2006) (accepting "the commonsense (and commonly observed) conclusion that customs officers may x-ray an airline passenger's luggage at the border without reasonable suspicion—a conclusion that several other courts have embraced and that none (to our knowledge) has rejected"); *see also United States v. Okafor,* 285 F.3d 842, 846 (9th Cir. 2002) ("We hold that examination of luggage and other containers by x-ray or other technological means may be done at the border with no required showing of particularized suspicion."); *United States v. Oriakhi,* 57 F.3d 1290, 1295, 1297 (4th Cir. 1995) (holding that the "search of [the suspect] at J.F.K. Airport"—the initial step of which was "to examine [his] bags . . . with a portable x-ray machine"—was a "routine" border search and therefore could be conducted "without ... any level of individualized suspicion"); *United States v. Udofot,* 711 F.2d 831, 839-40 (8th Cir. 1983) (upholding the "x-raying of appellant's luggage" once the court determined that the search was a border search and without analyzing what quantum of suspicion the government possessed); *United States v. Restrepo Naranja,* 643 F. Supp. 154, 160 (S.D. Fla. 1986) ("[T]he warrantless x-ray search of the Defendant's outbound baggage was reasonable and proper pursuant to the 'border search exception' . . . .").

## IV.    CONCLUSION

In view of the foregoing, the Court concludes that the border search exception to the Fourth Amendment—which permits routine customs searches without a warrant or any degree of suspicion—does not apply to searches of individuals and their luggage as flights arrive at the internal customs border in the Virgin Islands from the continental United States. However, because CBP officers conducted the searches in these cases with an objectively reasonable good-faith belief in the lawfulness of these searches, Defendants' requests to suppress the tangible evidence discovered as a result of the searches will be denied.[37]

An appropriate Order accompanies this Memorandum Opinion.

Date:   January 8, 2019                                   _____/s/_____
                                                          WILMA A. LEWIS
                                                          Chief Judge

---

[37] Defendant Barconey initially challenged the pat-down search of her person and search of her purse performed in the baggage claim area of the airport as unlawful. At the suppression hearing, Defendant Barconey conceded that the Court's resolution of the question whether the border search exception was applicable here would be dispositive with respect to those searches. She maintained, however, that officers exceeded the scope of their search authority by reading papers discovered in her purse. Defendant Barconey provided no authority for this proposition, and did not address the issue in her supplemental brief. Even if the Court did not find the argument waived, circuit courts have held that documents may be read during a routine customs search. *See United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (observing that if a CBP officer "merely skimmed the notebook and returned it to Levy without copying it, we have no doubt that the inspection would have been routine"); *see also United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (holding the border search of an electronic device permissible even without reasonable suspicion where "CBP officers simply had [the traveler] boot [the laptop] up, and looked at what [he] had inside") (internal quotation marks omitted); *United States v. Carreon*, 872 F.2d 1436, 1442 (10th Cir. 1989) ("[I]nspection of the [defendant's] vehicle, documents and belongings, the subsequent 'pat down' of the female passenger, and the detention of [defendant] while the agent went for his electric drill [to further search the vehicle] were all reasonable, routine border search procedures."). Thus, the Court finds that the reading of Defendant Barconey's papers, which allegedly listed the names of the marijuana in the four bags, was part of a routine border search performed with the objectively reasonable good-faith belief that such border searches were lawful.