# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> ORIANA BARCONEY, ) <br> ) <br>            Defendant. ) <br> ) | Criminal Action No. 2017-0011 |

**Attorneys:**
**Alphonso G. Andrews, Esq.,**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the United States of America*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Oriana Barconey's ("Defendant") Motion to Suppress Evidence and Statements ("Motion to Suppress" or "Motion") (Dkt. No. 19); the Government's Opposition to Defendant's Motion (Dkt. No. 26); Defendant's Reply to the Government's Opposition (Dkt. No. 33); and the supplemental briefing submitted by the parties as ordered by the Court (Dkt. Nos. 94, 98). For the reasons that follow, the Court will deny Defendant's request to suppress the statements that she made to Customs and Border Protection (CBP") Officer Richard Anderson.[1]

---

[1] The Court addressed Defendant's request to suppress the tangible evidence discovered as a result of the searches of her luggage by CBP officers in a separately filed Memorandum Opinion. (Dkt. No. 103). In that Opinion, the Court found that the warrantless and suspicionless x-ray examination and subsequent physical search of Defendant's luggage violated her Fourth Amendment right to be free from unreasonable searches and seizures. However, because the Court

# I.     FACTUAL BACKGROUND[2]

Defendant is charged in a two-count Information with Possession of Marijuana with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D), and Possession of Marijuana on Board an Aircraft with Intent to Distribute in violation of 21 U.S.C. §§959(c)(2) and 960(a)(3). (Dkt. No. 11). The Government presented two witnesses at the suppression hearing in this matter: CBP Officer Richard Anderson and Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Cassandra Desormeaux.

Officer Anderson testified that he was stationed at the Henry E. Rohlsen airport on St. Croix on the evening of February 16, 2017, and was tasked with performing x-ray examinations of luggage from an American Airlines flight arriving from Miami, Florida. In performing the x-ray examinations, Officer Anderson testified that he was looking for "anomalies" in luggage that might indicate the presence of weapons or contraband.

Officer Anderson observed anomalies in four bags arriving on the Miami flight. He removed the bags from the x-ray conveyor belt and opened two of them. Inside, Officer Anderson discovered gift-wrapped packages, which he proceeded to open. Officer Anderson observed what he suspected to be contraband—specifically, marijuana—inside the gift-wrapped packages. A

---

also determined that CPB officers acted with an objectively reasonable good-faith belief that the searches were lawful when they were performed, the Court denied Defendant's request for the suppression of tangible evidence discovered as a result of the searches. The Court also concluded that officers did not exceed the scope of the routine customs search authority they believed they possessed in objectively reasonable good faith when they read papers found in Defendant's purse. As such, the only issue remaining before the Court is Defendant's request to suppress the statements she made to Officer Anderson in the secondary inspection area of the airport.

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

CBP K9 officer was brought to the scene and alerted to the presence of contraband in the packages. After Officer Anderson discovered the contraband, the bags were closed and placed on the baggage carousel. Other officers were tasked with observing the baggage claim area to identify any individual who retrieved the bags from the carousel.

TFO Desormeaux testified that she and TFO Moses President performed surveillance in the baggage claim area. TFO Desormeaux observed a woman—later identified as Defendant—retrieve two of the bags from the baggage carousel. TFOs Desormeaux and President then approached Defendant, who was standing near a taxi stand in the airport terminal next to the four bags earlier identified by Officer Anderson as containing suspected contraband. TFO President told Defendant that law enforcement was investigating the contents of her bags and wanted to speak with her. Defendant agreed to answer questions. TFO Desormeaux performed a pat-down search of Defendant's person and opened Defendant's purse, where she observed baggage claim tickets. TFOs Desormeaux and President escorted Defendant, along with the bags, to the secondary inspection area in the airport.

Officer Anderson, other CBP officers, and Homeland Security Investigations ("HSI") agents were present in the secondary inspection area. Defendant provided her identification to law enforcement and consented to the search of her purse. The four bags were placed on an examination table in the secondary inspection area. Officer Anderson asked Defendant whether the bags belonged to her, and Defendant stated that the bags were hers. Because the labels on two of the bags bore a name other than Defendant's, Officer Anderson asked Defendant why two of the bags were labeled with a different name. Defendant replied that she did not know. Officer Anderson did not administer *Miranda* warnings to Defendant before asking these questions.

After Officer Anderson questioned Defendant, officers searched the four bags and removed contraband. An affidavit executed by HSI Special Agent Dennis Carter—who was present in the secondary inspection area—indicates that the search revealed a total of 48 vacuum-sealed packages containing a green leafy substance. (Dkt. No. 1-1). Four of the packages were field-tested and tested positive for characteristics of marijuana. The total weight of the marijuana was approximately 25 kilograms. Law enforcement also discovered papers in Defendant's purse that contained a list of marijuana names. Special Agent Carter took custody of the evidence and read *Miranda* warnings to Defendant. Defendant was then escorted to the Golden Grove Adult Correctional Facility on St. Croix, where she spent the night prior to her initial appearance in Court the following day. Before her appearance in Court, Defendant was interviewed by HSI agents at HSI headquarters.

## II. DISCUSSION

Defendant seeks suppression of the statements she made to Officer Anderson in the secondary inspection area on the ground that Officer Anderson subjected her to a custodial interrogation without providing *Miranda* warnings. (Dkt. No. 19 at 15-17).[3] The Government concedes that Defendant was in custody when she was questioned in the secondary inspection area, but argues that Officer Anderson was not required to administer *Miranda* warnings before questioning Defendant because he posed only routine customs questions to Defendant. (Dkt. No. 26 at 12-13).

---

[3] Because the Government represented at the suppression hearing that it would not seek to introduce statements made by Defendant during the subsequent interview with HSI, Defendant withdrew her request for the suppression of those statements.

A. **Applicable Legal Principles**

   1. *Miranda*

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST., amend. V. In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). *Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984). *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). "[T]he presence of both a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 395 (D.V.I. 1997); *see also Alston*, 34 F.3d at 1244 (same); *United States v. Mattox*, 2018 WL 3622777, at *3 (M.D. Pa. July 30, 2018) (same); *United State v. Mejia*, 2016

WL 7191630, at *19 (D.V.I. Dec. 10, 2016) (same); *Booker v. United States*, 2010 WL 2985982, at *12 (D.N.J. July 26, 2010) (same).

A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citation and quotation marks omitted). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). In order to conclude that a person who has not been arrested is in custody, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler*, 496 F.2d at 799 (internal quotations omitted)). "[T]he relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth,* 118 F. App'x. 649, 650 (3d Cir. 2004) (citing *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the Government. An "interrogation" has been defined as "(a) conduct intentionally designed to

6

evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### 2. Application of *Miranda* in the Border Context

In *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), the Third Circuit examined at length the application of *Miranda* rules in the context of immigration inspections at international borders, holding that "normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id.* at 529 (citing *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999)); *see also United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) ("[N]ormal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States.") (citing *Kiam*, 432 F.3d at 529–30). Immigration and Customs officers have a responsibility to inspect entrants at our borders, and "[s]uspicion of criminal conduct cannot overrule [that] simultaneous responsibility . . . ." *Kiam*, 432 F.3d at 531 (citing *United States v. Silva*, 715 F.2d 43, 48 (2d Cir.1983) (holding that Customs officers were "duty-bound to determine whether Silva was entitled to enter the country with her effects" regardless of their suspicion of criminal conduct, and *Miranda* warnings were not required)). Further, an individual seeking to enter the United States "does *not* have a right to remain silent." *Kiam*, 432 F.3d at 529 (citing *Gupta*, 183 F.3d at 617). As such, individuals seeking to enter the United States may be questioned without *Miranda* warnings even if subject to custody and may be "taken out of a primary inspection line for secondary questioning . . . ." *Kiam*, 432 F.3d at 529-30 (citing *Gupta*, 183 F.3d at 617-18). While *Kiam* specifically addressed immigration screening at international borders, a Third Circuit panel later relied on *Kiam* to apply its holding to the Customs inspection context. *St. Vallier*, 404 F. App'x at 656 n.4. ("[W]e find no material distinction between questioning an alien to determine

whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.") (citing *Kiam*, 432 F.3d at 531; *Silva*, 715 F.2d at 48).

The Third Circuit has recognized, however, that even in the border context, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). Where an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . this line has been crossed." *Kiam*, 432 F.3d at 530. The line is not crossed, however, where there is "mere overlap" between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution. *Id*. at 530 n.6; *see also St. Vallier*, 404 F. App'x at 657 (noting "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity" and holding that "questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*"). While "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution," the fundamental inquiry is whether a customs official's questions "bear upon both admissibility and criminal conduct, while not relating solely to the prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657-58 (citing *Kiam*, 432 F.3d at 530 n.6). If so, the questions are permissible and the answers admissible.

**B.     Analysis**

As recognized by the Third Circuit in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), and detailed in this Court's separately filed Memorandum Opinion, (Dkt. No. 103), Congress has maintained an internal customs border between the mainland United States and the Virgin Islands

since the United States acquired the Virgin Islands from Denmark in 1917. The Third Circuit has further held that customs officers may perform routine customs searches of individuals and luggage *departing* the Virgin Islands for the continental United States without a warrant or probable cause. *Hyde*, 37 F.3d at 117. Although this Court has concluded in a separately filed Memorandum Opinion that the warrantless and suspicionless searches of individuals and luggage *arriving* in the Virgin Islands from the continental United States are unreasonable under the Fourth Amendment, (*see* Dkt. No. 103 at 23), the Court did not suppress the evidence discovered as a result of the search conducted herein based on the Court's finding that CBP officers stationed at the internal customs border have performed their duties for at least the past 20 years under the objectively reasonable good-faith belief that individuals and their luggage arriving in the Virgin Islands from the continental United States are subject to the same customs inspections as individuals and their luggage departing the Virgin Islands for the continental United States, *id*. at 30-31. This includes the authority to ask routine customs questions for purposes of determining the admissibility of persons and effects.

Accordingly, for purposes of its analysis here, the Court will consider the questions that Officer Anderson posed to Defendant in the secondary inspection area of the airport in light of his objectively reasonable good-faith belief that his authority to ask questions regarding the admissibility of persons and their effects as they arrived at the internal customs border from the continental United States was identical to the authority he possessed to pose such questions to individuals departing the Virgin Islands for the continental United States. In other words, the Court will examine Officer Anderson's questions as if they had occurred at the equivalent of an international border—as the internal customs border between the continental United States and the

Virgin Islands is treated with respect to individuals and luggage departing the Virgin Islands for the continental United States.

The record evidence establishes that Officer Anderson asked Defendant two questions after she was escorted to the secondary inspection area: (1) whether the bags were hers; and (2) why two of the bags were labelled with a name other than her name. At that point, Officer Anderson had already discovered the suspected contraband in Defendant's bags. Defendant was not advised of her *Miranda* rights before Officer Anderson questioned her.

*Kiam* and *St. Vallier* are instructive here. As described above, Officer Anderson posed his questions to Defendant in what he reasonably believed to be a unique border context where "normal *Miranda* rules simply cannot apply . . . ." *Kiam*, 432 F.3d at 529. The determinative question thus becomes whether Officer Anderson "crossed the line" established by the Third Circuit in *Kiam* when he questioned Defendant about her ownership of the bags without providing *Miranda* warnings. If Officer Anderson's questions "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the questions crossed the line, and *Miranda* warnings were required. *Id.* at 530; *see also United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015) (finding that *Miranda* warnings were required where CBP officers asked a defendant questions about his involvement with drug activity that "had nothing to do with whether or not to admit [the defendant] into the country."). But if there was simply an overlap between questions relevant to Officer Anderson's customs duties and questions relevant to possible criminal conduct, the questions did not cross the line, and no *Miranda* warnings were required. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657.

The evidence before the Court established that Officer Anderson suspected Defendant's involvement in criminal activity before he questioned her. But this fact is not dispositive. The

Third Circuit has made clear that a "mere overlap" between questions relating to admissibility of persons or effects and questions relating to criminal activity does not trigger the need for *Miranda* warnings. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657. Indeed, the Third Circuit has specifically *refused* to hold that "if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the [individual] before questioning him on any subject." *Kiam*, 432 F.3d at 530. As explained in *St. Vallier*:

> [D]eterminations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity. A criminal offense, such as illegal reentry, may be inextricably tied to a person's admissibility, yet customs officers are not required to provide Miranda warnings prior to asking questions that might bear upon this illegal conduct. The same is true when an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border. Accordingly, suspicion of criminal conduct does not overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders. Similarly, questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*.

*Id.* at 657 (citations and internal quotations omitted). Further, the test outlined in *Kiam* and *St. Vallier* calls for an *objective* inquiry into whether the Customs officials' questions ceased to have a bearing on their customs duties, rather than an inquiry into the subjective intent of the officers in questioning an individual. *See United States v. Harder*, 180 F. Supp. 3d 355, 365 (E.D. Pa. 2016) (finding that regardless of Customs agents' "subjective intent, their questions certainly had a bearing on Defendant's admissibility and did not '*only* further a potential criminal prosecution'") (citing *Kiam*, 432 F.3d at 530).

Officer Anderson's questions to Defendant addressed one theme: ownership of the luggage. Officer Anderson testified that it was important to know who owned the bags, as he

11

wanted to be sure that there was no mistake that the person being questioned in the secondary inspection area—Defendant—was the owner.

Given the objective nature of the inquiry as established in *Kiam* and *St. Vallier*, the Court finds that Officer Anderson's questions were relevant both to Defendant's "admissibility and [to] criminal conduct, while not relating solely to prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657. Undoubtedly, Officer Anderson's questions elicited inculpatory responses that would aid law enforcement in its criminal prosecution of Defendant—specifically, her admission to ownership of bags containing suspected contraband. But basic questions about an individual's ownership of luggage are fundamental to CBP officers' inspection duties at a customs border. Although *Kiam* cautioned that once an individual "admits to a[] []customs inspector that he is smuggling drugs into the country, it might be improper for the inspector to proceed to question the [individual], without *Miranda,* regarding the weight, purchase, and plans for, the drugs he is smuggling," Officer Anderson's questions were limited solely to an inquiry into whether Defendant was the owner of the bags and why a different name appeared on two of the luggage tags. *Kiam*, 432 F.3d at 530 n.6. Indeed, the evidence shows that after Officer Anderson asked these two questions, his questioning of Defendant ceased. This is precisely the established procedure that the Third Circuit discussed approvingly in *Kiam*. *Id.* at 530 n.5.

In short, because the routine customs questions asked by Officer Anderson were objectively relevant to his customs inspection, he was not required to provide Defendant with *Miranda* warnings before questioning her. Defendant's arguments to the contrary are rejected and her statements to Officer Anderson at the secondary inspection area will not be suppressed.

## III. CONCLUSION

For the reasons discussed above, the Court will deny Defendant's Motion to Suppress as it relates to the suppression of her statements to Officer Anderson at the secondary inspection area of the airport.

An appropriate Order accompanies this Memorandum Opinion.

Date:  January 8, 2019                         _____/s/_____
                                                WILMA A. LEWIS
                                                Chief Judge